2015-51-66, 2015-51-84, 2015-52-04, A. Gerald Pierce, V. Richard Smith, I. Henry Smith, I. Matt Malone, and I represent the defendant, David Pierce, in this case. This is essentially a income tax case where these folks essentially claimed to have worked for various casinos in Las Vegas and made absurd amounts of money, claimed to have made $1,000,000 and paid in $600,000 in were able to get this money. And then I will say the district court did make an apt observation at sentencing that used the expression that pigs get fat, hogs get slaughtered, I believe is the apt expression that the court used in describing what happened afterwards, is that in about year one when this happened, years going by, these folks continued to submit these refund requests, which were never approved by the IRS. This case started with me. My law partner got a call from a potential client who turned out to be David Pierce, who was calling because he claimed to have income tax problems. My law partner used to be the general counsel to the Kentucky Department of Justice, and he used to talk to folks occasionally for IRS issues. Well, when he learned what exactly was going on, it turned out to be a little bit more than a typical run-of-the-mill income tax problem. So, frankly, the IRS investigator was cackling on the phone, and I won't go into the adjectives that he used to describe Mr. Pierce, but suffice it to say that he was not too impressed with the level of intelligence used to execute this scheme. And that's the reason we're here, is the sophisticated means enhancement that was applied in sentencing. The first effort, your client used his son's I.D. That's correct, Your Honor. And used his son's residence in Kentucky. Is that correct? I believe that to be correct. I can't recall off the top of my head if they were living together or if they had close residences, but they Or maybe he used Dwayne Smith's address. I believe that's correct. But it was in Kentucky. That's correct, Your Honor. He did use Dwayne Smith's address. Then he moves on after striking pay dirt. Correct. He moves on to Nevada. He starts coming up with businesses and addresses in And there's no state income tax. Pardon? No state income tax. Right. Yes. Were those real businesses? My recollection is yes, because they had to have the F.E.I.N. number. F.E.I.D. Correct. Correct. So I think essentially my recollection is that he would Google, for example, MGM Grand, the casino, and he would find out what their F.E.I.N. number was, and that's how he would input the information into TaxSlayer or TurboTax. And then he picked an address there in Nevada for his co-conspirator? Was that the one? He essentially put the address in, but then he routed the money to his own bank account in Kentucky. And that's where the IRS investigator found it. Why isn't that some evidence of sophistication? He starts out with a local guy, local address, and then he moves on to bigger stuff. I mean, MGM Grand, there's money there. Fair enough. But I will say this, Your Honor. I think that the reality is when you look at this scheme in the greater picture here, what these folks did, it seems to me that my client could have just gone to the public library. He could have gotten a 1040EZ form that's sitting up there. He could have, but this is what he did. But it's about the same thing, and it had the same effect, and that's where I go to it as is. How many cases have you found where the enhancement for sophistication has been overturned on appeal? Not very many. I can't find any. Yeah. And I looked at it yesterday, and one thing I found that was interesting is that, you know, some of the language in the cases points out, well, it's almost invariably applied. You know, when does it not apply? And, you know, in thinking through, I think what happened in sentencing is that the assistant U.S. attorney said, Well, you know, if it had been a regular taxpayer and he simply had increased his deductions and said that, you know, his income wouldn't change, but he increased his deductions in an effort to get a bigger refund, that wouldn't be sophisticated. Well, you know, I got to thinking about that. Well, the thing in this situation is, I mean, when David Pierce uses his own information or uses his son's, and they use actual people's information, but they simply increase the income, that's no different than changing the deduction amount. It's essentially the same effort because the end result is just trying to get a bigger refund. Why isn't the best evidence that this was sophisticated, the fact that they got, what, hundreds of thousands of dollars from IRS? You've got to, I mean, you know, they didn't get them all, but they did pretty darn well. And how did you get around that? Well, you know, you've got a situation, Your Honor, here where it's a simple fraud that was perpetuated over and over again. You know, this is no different than, like I said, you could go to the library, fill out the form, submit it. It doesn't make it sophisticated. I mean, there was no, if you look at the guideline, the guideline's talking about offshore bank accounts. It's talking about dummy corporations. And what do we have here? We've got a guy that just basically cooked up a... But the dummy corporation fits. Your Honor, I don't... It has to fit, doesn't it? Well, I mean... We talked about he goes to Vegas and figures out where. I mean... Well, he got on the computer in Kentucky and he looked up the... I realize that, but he was dummy, he's dummying, in a sense. I don't know. I think it sounds like it... I don't know. You know, there's case law. I get the extension. And the case that the United States cites a lot is that COPEX case. And I've looked at that about whether or not that would fit or not. And, you know, I think that if David Pierce had routed the money offshore or routed the money to another bank account with the purpose of concealing it, I think maybe there's a better argument. But I think this is one of those cases that's frankly on the line as to whether or not it's... And when it's on the line and the standard of review is abuse of discretion... I understand, Your Honor. I understand the point. But I would say this, that, you know, the other thing I noticed when I was reviewing for this oral argument is that it also is apparent that the federal sentencing guidelines have been updated in 2015, and the language has been changed to actually basically limit, more so limit the sophisticated means. Calls for more sophistication maybe. Well, I think it calls for... Let me see the language exactly. But it essentially said that... Does your client benefit from a change in the guidelines language? Maybe. Maybe.  What it said before was otherwise involve sophisticated means, end quote. Now it says, end the defendant intentionally engaged in or caused the conduct constituting sophisticated means. This may be more apparent for the other defendants, but I will say this, that with respect to Mr. Pierce, I mean, what do you have going on? You've got David Pierce sitting at a computer, and you've got people coming to him with their information and saying, submit my information, you know, I want what you got. I want your deal. I want the money routed to, you know, the money would go half to David's bank account and half to the other co-conspirator's bank account, which never worked, by the way. But that's kind of what we had, and all they're doing is saying, here's my information, here's my false income information that I earned, you know, and I worked at MGM or Caesars Palace or wherever in Las Vegas, and then here's the FEIN number that I pulled off the Internet for that literal corporation, which, by the way, I think, if my recollection is correct, is that's part of the reason that this got found out so quickly is that MGM and whoever else was notified by the IRS, hey, who are these people that are, you know, claimed to be employees. Should the fact that Mr. Pierce encourages or facilitates co-conspirators figure into this sophistication? I think this, Your Honor. I think that it's a simple fraud perpetuated over and over and over. I don't think that changes the calculus for Mr. Pierce. I think that you've got a situation where, you know, the guidelines appear to be amended in a sense that they're trying to limit it, and essentially, in a situation like this, you've basically got, let me point out before my time runs out to you, Your Honor, probation also agreed that there was no sophistication here as well. Obviously, the court disagreed, but I think that probation's reasoning that this. Can I ask a question? Yes, Your Honor. Is there evidence in the record that the reason your clients selected Nevada was because there's no state or there's no state income tax there? I can't say that there is, Your Honor. I don't know off the top of my head. I mean, you mentioned it. Yeah. I don't think that there's going to be any direct evidence of that. Yeah. But I just know from dealing with Mr. Pierce. All right. Thank you. Thank you, Your Honor. Good morning. My name is Robin Cornett. My defendant is Timothy Smith, and I would like to reserve three minutes for rebuttal, please. All right. I believe Judge Norris had asked a question or had made a comment suggesting that perhaps this wasn't a good case to overrule a lower court because there aren't very many cases which have overruled a district court judge's determination. Well, it kind of speaks to being a pretty low standard to me. I think what I wanted to – the reason why I wanted to get back to that question is that when you look at the vast majority of cases that deal with sophisticated means, they are so incredibly more complex than the one at bar. Very few of these cases involving sophisticated means are as simple as this one because ordinarily, if they're as simple as this one, they're not going to be found to merit the enhancement below. And that is why, Your Honor, I think there's so very few overruled because when you're dealing with multi-jurisdictional issues, when you're dealing with offshore accounts, when you're dealing with people who've created businesses in order to accomplish their fraud, it's pretty obvious that it's sophisticated. And this is one of the few cases, and why there are so few cases on sophisticated means, that isn't sophisticated. And, in fact, I think it's why we need some form of published case to give some analysis to guide the district court judges in how to handle these cases. What about this United States v. Coppice case from our circuit in 2005? That case would seem to give some guidance, and it would seem to be really against your position. What do you say about that case? Well, Coppice case was an unpublished case, Your Honor. Back, I think, in 2003. And in Coppice, they applied the clear error standard of review. There was no discussion, really. There was not an elaborate discussion in Coppice. I mean, it was- What do you- I thought that the standard review was- is clear error. I was thinking it was abuse of discretion. I believe Coppice used the clear error standard, Your Honor. And it would be our position that the Coppice case actually was probably wrongly decided. And even if the court were to consider the Coppice case to be correctly decided, there's not a lot of analysis in the Coppice case to guide lower courts or this court. There was one significant difference in the Coppice case, and that is that they made up names in order- they made up names in order to accomplish- to try to accomplish their refund fraud. And that- arguably, that made it more difficult to conceal because they had made up people and false addresses. They were- I think, Your Honor, it would be our position that the Coppice case was wrongly decided. What about United States v. Castro from our circuit? That's another case that would seem to be against your argument as well, wouldn't it? Well, it wouldn't be against our argument, I think, in terms of the- it would be against our argument in terms of the standard of review. And I think that we do have a problem in the circuit that there is a conflict between the Crossbrook case and what should be the appropriate standard of review and the Craig case. The Craig case was a much earlier decided opinion of this court, and it's very clear in the Craig case that the standard should be that of the individual's actions. And in this case, as Counsel for Mr. Pierce pointed out, he had the main guy. He had the one which the court identified as the mastermind. He was the one who put the refund scheme together. My client, Mr. Smith, when you look at his actions, which the Craig case indicates that you should, he did not do anything sophisticated. He was almost sort of analogous to a drug mule in a drug case. He passed information. He delivered things. He gave names. He gave addresses and Social Security numbers and delivered checks. But that was the extent of Mr. Timothy Smith's involvement in the case. I know you're arguing about the standard of review, but do you have any cases from our circuit with similar facts that would support your argument? In terms of the standard of review, Your Honor, or in terms of whether this type of fraud against the government was sophisticated? The latter that would have similar facts that would, and to our case here, that would touch upon the issue of whether this was a sophisticated means enhancement. No, Your Honor. All of the cases with the exception of COPUS, which we previously discussed, are considerably more sophisticated and complex than the case at Barr. And so all of the panels which reviewed the frauds in those cases were dealing with frauds that were obviously more complex than the one that was at Barr. So you don't have a case with facts similar to the case at Barr, which says that the scheme was not sophisticated. We don't have the benefit of that. No, Your Honor. But I think that there is somewhat of a common sense look at this. What these individuals did was they filed personal income tax returns, and they made up what was necessary. You know, in order to have, you know, a fraudulent refund scheme, you have to make up information. And that's essentially what they did. They used real names, real Social Security numbers, real EINs, real addresses, real bank account information. All that stuff would make it easy for them to find. And what they made up was things like the income, how much someone made, how much someone deducted. Oh, they stole Social Security numbers. Yes. And that would be one other thing that they did. They used their own. They used some that people said, hey, you can use my number. I'll get a cut by agreement. And they stole three names and Social Security numbers. That sounds pretty intricate and sophisticated to me. Well, it is multiple times, Your Honor, and that is true. But what I am hoping is that this case is not going to stand for the principle that doing something over and over again, repeated, is enough to be sophisticated. Because the guidelines had, I believe, something clearly more in mind, you know, especially complex and especially intricate. Well, do you have some commentary in connection with the guidelines that would, you know, support your argument that the guidelines wasn't intended to cover something like this? My point of departure is the guidelines couldn't specify or foresee all factual eventualities. Is there some commentary to the guidelines that makes you say what you're saying? I believe, Your Honor, it defines it within the guidelines that sophisticated means it's something that's especially intricate or especially complex. And then the application notes give concrete examples, which I'm sure the Commission, that was the best they could come up with, is that they're trying to give you kind of a range. And so they give these examples of offshore accounts. You know... You're out of your time unless you want to take some of your rebuttal time to continue. No, Your Honor. I will just wait for the rebuttal and thank you very much.  Good morning, Your Honor. Good morning. My name is Jeff Rager on behalf of Dwayne Smith, the final defendant in this case. I think I'd like to reserve one minute for rebuttal, please. May it please the Court. Counsel for the United States. I'm going to focus my argument on what I believe should be the standard review dealing with my client. When I say standard review, I don't mean whether de novo. I think this case should be de novo, because we don't really question the facts that the district court came up with in order to establish this finding that they were sophisticated. What we do question is the application of those facts to this guideline. But I want to focus more on that and what my client actually did in this case and what he did to conceal. But first, I'm going to touch upon the overall scheme. I think my co-counsel... How much does your guy make? You know what, $200,000. But I don't think that the amount of money that somebody makes should be a factor in the sophistication. I begin my look at this by looking at the guideline definition of especially complex and especially intricate. Now, we're not just talking about complex here. We're not just talking about intricate. They specifically put that modifier of especially before both of them. And when I look at the facts of this case, I just don't see these facts rising to that level. I look at this more along some of the comments I saw in the Jagum case or the Pierce case, not this Pierce. But this is lying on a tax form. Where does the especially come in? That is in the application notes to the guidelines itself, Your Honor. Because the guideline, it just says, involves sophisticated means. The guideline says that, but when you go to the application notes, Your Honor, it goes and gives a little further definition, especially. And as soon as I saw that language... I'm taking it that the argument that you'll offer to us today is the same that you offered to Judge Greene. I don't think I'm going to change my argument here. That's right. But despite the best efforts about especially, and all of this was also said to Judge Reeves, and he nevertheless found an enhancement applicable here. So what persuaded him? Do you wonder if you... I think what persuaded him was the $200,000. The money. That's what I wonder. That's exactly what I think made him apply it in this case to my guy. But going back to what I was saying here is that, you know, could anyone have accomplished this scheme? And I think the answer is yes. I think a teenager with an iPhone and an app on it from a beach could have. What about guys like me who don't use computers? I couldn't do it. Well, my client keeps on wanting me to use this analogy, so I'm going to use it. The stone and chisel was state of the art at one time until we came up with a pencil. Now we've come up with a computer and we keep them in our pockets all the time. There's nothing sophisticated about that anymore. The only thing that I think about these guys, the only hope they had of not getting caught, was two things, attrition and luck. And when I say attrition, what I mean is that the IRS was just too busy to realize that somebody didn't pay $1.9 million in taxes before they issued a check or sent it to an account. That is what they were counting on, not any layers of the onion of sophistication. But what I want to focus for my argument is on Dwayne Smith's actions. And I want to say that the 1996 case of U.S.D. Craig got it right. When they said a scheme can be complex enough to be considered sophisticated, but that should not be attributed to an individual defendant unless that person's personal involvement was sophisticated. The guidelines now have been changed to reflect that very thing that's been the law in this court since 1996. And the reason for that is because we want to reflect the individual culpability of each defendant. You know, Dwayne has always maintained that his actions in this case were passive. He said, yes, use my identification, use my address. But he never met David Pierce, never spoke to him, had no input on what David Pierce was putting into these, I guess he used TurboTax or something, Best Buy, what numbers were being put into this. And I'll tell this, that he never even saw that 2008 return until I showed it to him in discovery in this case. Again, I didn't disagree with that when the district court said, you know, I think he had general knowledge of what was going on, just not all the details. He didn't hide it, and that's my point. You know, when I look at what he did to conceal this, I won the lottery, or I won at gambling. Can we think of a more common or asinine excuse for having a bunch of ill-gotten gains? How sophisticated is that? It's not. It really isn't. Or the fact that he, and this is what's important too, the very device of this fraud, the tax return itself, had Dwayne Smith's name on it, had Dwayne Smith's Social Security number on it, had the account number going to a bank in Mount Sterling, Kentucky. And that's all that the IRS had to look at once they figured out after four months that this wasn't quite right.  Well, I would think, okay, if they used a warehouse bank to put a different layer between them and the government authorities, because those only go by account numbers. I think that was mentioned in one of these cases. Or even if my guy was smart enough to go under the $10,000 reporting, he didn't. What he did is this $200,000 appeared in his account, and the scheme amazingly worked, and he went to Las Vegas and gambled $25,000 of it. And then the money was sent right back to the same bank. And I'll say this is important too of how sophisticated this is with my guy, is all the IRS needed was that device of the fraud and a subpoena to one bank with one bank statement which showed every single transparent transfer. There was nothing smart about this. As a matter of fact, I mean... They had to go look at the bank records to figure it out. That is, and I do believe that the IRS, I questioned about that during our sentencing hearing. That's a standard tool of investigation. You know, I think I do need to talk about a couple things. Repetition and the Kulpitz case. I know I'm running out of time here. But I would think, and I believe this was said by somebody else, that committing a simple fraud over and over again does not make it sophisticated. This is the repetition we're focused on. This is the repetition we're focused on. You're all saying the same thing. Right, we're saying the same thing. But here's the thing. When we look to analysis of repetition when it comes to this, that repetition has to contribute or reflect upon the complexity or the intricacy of the case. There's nothing that these people repeated that created more layers of the onions for the government to appeal back. On the Kulpitz case, which again was an unpublished case, but it had similar facts and I agree it was wrongly decided. Because my question to this court is, how sophisticated can a crime be that can be committed from a jail cell? Really. And also that when you look at the Kulpitz guy, he was the right-hand man. He actually planned it with the guy in jail, winded all the legwork, made up all the false addresses for these things to be returned, got all that stuff together and gave it to a guy who apparently filled out the form and sent it off from a jail cell. That's just not sophisticated. And I think it's important to look at what's not in this case. No warehouse bank, no lawyers, no CPAs, nothing to make it look more legit. Again, what it comes down to, when you look at this case, you don't look at it and say, man, how ingenious were these guys. You look at it and say to yourself, how did they expect not to get caught? That is how you look at this. And it's because they did not do very much to conceal who they were, where the money went, and it took four months, four months for the IRS to figure this out. Thank you. Thank you. Good morning to the court. Good morning. My name is Andrew Smith. I'm an assistant U.S. attorney down in Lexington, Kentucky, which is in the Eastern District of Kentucky. Respectfully, I'd like to start with kind of the running theme, I think, from my counterpart's arguments, which is that these guys couldn't have expected not to get caught, and frankly what they're saying, the subtext here is, how could they be this stupid? But respectfully, sophistication is not synonymous with stupidity. You wouldn't get a lot of conviction. I think that's exactly right. And that's kind of the point. Sophistication is not synonymous with success. It's not synonymous with being well advised. What do you think moved Judge Reeves? Obviously the government pressed Judge Reeves to find the enhancement here. And, I mean, you've heard the arguments. It's a close call, very close. What's the stronger than they've talked about? What do you have that's stronger? Respectfully, Judge, I actually, the government doesn't think it's a particularly close call, and I don't think that Judge Reeves wants a close call. I can just walk through the court. I think some of the factors, when you really kind of parse them out, I know what it's described as, hey, they used simple tax forms, they put their own names on it. How could they be this stupid? Go ahead. Go with it. So let's look at kind of, and these are the factors that, when you look at the case law, that kind of get teased out. Repetition, they used 13 different returns with 11 different identities. There's coordination between multiple individuals. There's five co-defendants in this case, three of whom were before the court here. They used real employer IDs out-of-state. They used addresses out-of-state. That takes sophistication. They used, they deposited the money in multiple bank accounts. Even in the very inception, kind of at the simplest, when Mr. Pierce used his son's name, but they sent the check to Duane Smith, a gentleman he didn't know. That then kind of morphed into kind of increasingly sophisticated conduct, where they took kind of more elaborate steps to evade detection, including using out-of-state addresses, out-of-state employers. The process of filing these returns also generated false W-2s, and they used two stolen identifications. All of those things kind of cumulatively indicate a pretty sophisticated scheme doing it once, much less doing it 13 times. Now, each of the defense attorneys kind of said over and over again that just doing something simple over and over again doesn't make it sophisticated. But frankly, that's not what the case law says. The case law says the very opposite. I point the court to USC Masters and a number of other cases that say just that, that individual acts which in and of themselves aren't sophisticated, either when they're repeated or when they're taken together, do add up to sophistication for the purpose of this enhancement. And that's exactly what happened here. To kind of tease out from the briefs and some of the comments today in argument kind of what the unsophisticated acts were here, I think each of those kind of fall by the wayside when you look at the case law. The first is that, hey, look, these guys used their own names. They used their own bank accounts. It all led directly back to them. That was the case in U.S.P. Pierce, U.S.P. Middleton, U.S.P. Clear. For instance, U.S.P. Clear, you know, a guy essentially doesn't pay his income taxes, so the IRS levies his – he puts a levy on his employer's kind of payment of his – he's an independent contractor so it's not his salary but those funds. So what he does is he takes, you know, a fake letter, a fake form from the IRS supposedly to get rid of that levy and get the money sent back to him. It's all in his own name and it's all traceable directly back to him. Frankly, that's a lot less sophisticated than using 11 different identities here, some of which are stolen. The next point they make is that there were no offshore accounts or shell companies. And Judge Cook, you kind of raised this point, which, you know, didn't the defendants here kind of use dummy corporations? On one hand, no, because, you know, MGM, companies like that are real. They're not dummy corporations. But it's the same idea, and the idea is they didn't actually work for these companies and they purposely put these other companies in a different state so that you couldn't track them down for your reasons. There wasn't a direct tie back to Dwayne Smith in Kentucky when you put an employer out in Nevada. And the last is, again, this point that, you know, they were unsuccessful. They got caught. Well, that's the case for every defendant that appears ultimately before this court in each of the cases that are cited in the briefs. All of those people got caught. So whether you get caught or not, and frankly the relative ease with which the IRS can catch someone, doesn't really speak to the level of sophistication of the scheme. The other point that's raised briefly in argument today is this supposed conflict between there's a Craig case and a cross-growth case. And it's a little bit tenuous, but I just wanted to walk the court through this very briefly because I think it's important to kind of understand what happened. Craig was back, I believe, in 1996, and there is some language in there that indicates when you're looking at applying the sophisticated means, you need to look at the conduct of the individual. Respectfully, the government reads that as kind of just re-articulating what the general rules for relevant conduct are. If you look to the application notes, 1.1.3, the general relevant conduct rules, it says, yes, you can apply the conduct that is foreseeable to that defendant, but you still have to look as to that defendant. In other words, the scope of the conduct a defendant is liable for is not necessarily the same as that of the whole conspiracy. That's essentially what Craig says. So help us think about from David Pierce down to the last gentleman who says, my guy did nothing. He got money and banked it and told a whopper about where it came from but didn't do much, wasn't in the leadership role or any such thing. Do we distinguish as among them? Not for this. There are other, of course, there's other enhancements that do distinguish. Like, for instance, the leadership role enhancement or minor participant role. For this enhancement. No, I think it's just... They're all the same. Yeah, it's kind of binary. It's either you are or you aren't. And here, the whole point is that it's completely proper to apply this enhancement to each of them based on their own individual conduct, but also for the additional basis, and this is where that Craig and Crossgrove supposed dispute comes into play, which is you can also apply it based on the reasonably foreseeable actions of others with whom you're engaged in the criminal enterprise. But it's important to note that in 1998, there was... So Craig applied 2T1, which is an analogous provision, but it applies to tax cases. Here, this is the 2B, but it's essentially the same sophisticated means. In 1998, the committee amended that, and what they essentially said... I can just read it really quickly for the court, just so it's clear, because this wasn't mentioned in the briefs. What they said is, there was an amendment regarding whether the enhancement applies on the personal conduct of the defendant or the overall offense conduct for which the defendant is accountable. Consistent with the usual relevant conduct rules, which is what I just discussed, the application of this new enhancement for sophisticated concealment... It was called sophisticated concealment back then. It's called sophisticated means now. That kind of morphed over time. Accordingly, it's based on the overall offense conduct for which the defendant is accountable. Now, that goes fast forward then to Crossgrove, which was in 2011, where this court articulated just that, noted that you apply the same relevant conduct rules. I'd note that the 3rd, the 7th, the 8th, the 11th, in addition to the 6th Circuit, all kind of found the same between 2009 and 2015. At the last point, this was raised, is there has been an amendment. And what happened in the amendment for the 2015 guidelines is, and the commentary makes this kind of clear, is the commission decided they wanted to narrow the application of sophisticated means enhancement to individual conduct. So you have to show that that individual intentionally engaged in that sophisticated conduct. But that kind of tells you everything you need to know about what the rule used to be. Otherwise, it wouldn't be an amendment. And that's essentially what the court noted, that it wasn't just a mere clarifying comment. It was an actual substantive amendment. The court said that in U.S. v. Finley earlier this year. So with all that together, the rule in play is clearly that either on their own merits, each of the conduct they engaged in constitutes sophisticated conduct, sufficient for application of the sophisticated means enhancement, but also the conduct that they all collectively engaged in that was foreseeable to each of the co-conspirators here. Before I sit down, I just want to address a couple points that were raised by my counterparts. One question that's come up is, okay, so if it applies here and it applies in all these other cases, when does it not apply? When does sophisticated means not apply? I advise the court, you don't need to look any further than this own case. There were two co-defendants in this case that the sophisticated means enhancement didn't apply because they got involved later. Their conduct was relatively minimal compared to these defendants. You know, when you look at the kind of run-of-the-mill, garden-variety, tax-fraud refund scheme, you know, I could do this by just looking at... What distinction is there between the folks who didn't get it and these? What did those folks do? Those folks had kind of different... They entered in the conspiracy late. They offered some of their own personal identification information. They frankly did somewhat similar conduct, but the really key thing to bear in mind is that Pierce, Timothy Smith, and Dwayne Smith really were all engaged in this to begin with. Timothy Smith and Pierce worked together. They entered later. Does it suggest that the money was the factor that persuaded the court here? I think the... I kind of disagree a little bit that the money is not a factor. I think the money certainly should be one of the many things that a court looks at. Obviously, if you get $600,000, as they did here, that gives everybody pause and says, whoa, that's a lot of money. They must have done something to get that. But I think what the court really looked at, for instance, with Dwayne Smith, we talked about his... Not only did he get $200,000, but he takes that money, he then wires it to the Bellagio. He wires a different amount back to him. He then sends that to two different bank accounts. In the course of that, he tells somebody else he's trying to evade, essentially, where the money comes from. Once you start getting into multiple wire transaction casinos, I think when Judge Reese heard all that, I think he'd heard enough. The other quick item that Dwayne Smith's counsel a moment ago raised, that he thought that this should be a de novo review. Respectfully, the cases are a little bit all over the place with what standard review applies. I think it's fair to say, typically, that a factual determination receives clear error review. A legal determination receives de novo review. But one issue that hasn't been taken up by this court in this very specific context is the Supreme Court case Buford, which talks about a deferential standard review that applies when we're reviewing guidelines and applications. I'd like to submit that this case, should the court decide to publish a decision, should further that and say that Buford does apply to this enhancement of sophisticated means under 2B. We noticed that the Tenth Circuit in 2008 did that very thing in U.S. v. Jones. I don't think it's actually a particularly controversial move. I just don't think this court really has the occasion to do it. But the whole point is it's something more deferential than a de novo review. The Supreme Court articulates why that is, but it's essentially the court below is there, kind of in the weeds, and has the ability to look at these things. Finally, you know, there was one statement, a couple of statements made about kind of the passive nature about each of these individuals involved, that Pierce just kind of took information that was coming to them. I think that's believable, what the facts are. The facts are that Pierce and Timothy Smith really came up with this scheme. They reached out and solicited this information. Dwayne Smith got that information. Dwayne Smith's counsel made the conduct that his conduct was completely passive. But, you know, he used two stolen identifications, passed that to his brother, to Pierce. We talked about the business with wiring money to the casino. That's hardly passive. So with that, if there are no further questions from the court, I think I'll heed Judge Norris's comment earlier this morning. There's no requirement to use all my time. Thank you. And we'll have rebuttal. And if you're just going to repeat, Sparris. I will try my best not to repeat, Your Honor. The first issue I wanted to deal with is the Masters case. That was brought up by the government's counsel in his argument, and he said that the Masters case did rely upon, you know, repetition and series of action. If you analyze Masters case, which I spent some time doing that in my brief, what you find is that Masters has analysis. They explain that it's not merely doing something over and over again, but there has to be some coordination and some planning, some series. We don't have that here. Each tax return is a single event on its own where stuff is made up, and that's all it is. And I would submit, Your Honor. Within an overall plan, each act was not unto itself. There was an overarching plan here. They did plan to defraud the government through income tax refund fraud. That is true. But there was no planning in between these events. Well, they had to coordinate getting addresses from each other, Social Security. That's coordination, isn't it? It is, Your Honor, but there has to be a little bit of coordination in any scheme. That is true. But there is no coordination or planning here that is more than here is a Social Security number, here is an address, here is my bank account number, and everything else is made up. If this income tax refund scheme is especially intricate and especially complex, which is in the number nine commentary in the guidelines where that language is referenced, then any of them are going to be. So we need analysis to help us differentiate between these types what sophisticated means is. And that's the problem where Judge Cook asked about, well, what did Judge Reeves rely upon? And he relied upon the amount of money, the success, and the repetition. And he didn't apply any analysis. He just said, well, look, this is more complicated than an individual just, you know, making up a little bit of stuff because you've got multiple times here and multiple names. And that was it. He took the simplest, the lowest bar, he took the simplest income tax refund scheme and said because this case is not that simple, it is therefore especially intricate and especially complex. If you look at the Fourth Circuit case, which is the Adagio case, which I didn't get a chance to get to, Your Honors, in that case they said it has to be more than what is inherent in the fraud in order to be sophisticated. That case involved stolen identities, just as this case did. And Your Honors had asked me for a case previously that was similar, and I would submit that that's the closest one there is. And in that case the Fourth Circuit analyzed this decision and said, look, you're going to have fraud, you're going to have lying in every one of these cases. It has to be more than using fake names, misappropriate identities. It must be more than that. And if it's not, it's not sophisticated means. And the Masters case also makes that pertinent, and the Clear case, which says there has to be some planning. And there is no planning here other than what is absolutely necessary to accomplish the fraud. Therefore, Your Honors, it is not sophisticated. I see I'm out of time. Thank you very much. And hopefully I didn't keep you. I'd like it for that Fourth Circuit case. It is in my brief, Your Honor, and I apologize that I – What's the style? United States v. Adagio, and I'm mispronouncing it. I apologize. A-D-E-J-O-U, I believe. And it is in Mr. Kennethy Smith's brief. Thank you, Your Honors. Your Honor, may I get a copy of the results? Sure. Anything you can't remember. I've got to have these notes somewhere. 756 F-3250, Fourth Circuit, 2014. I believe it's U.S. v. Adagio. Is that what it is? Thank you. You're welcome, Your Honor. I've only got a minute left, so I'm going to see how much I can get out in just one minute in response here. But the first thing I want to say is that going back to the money issue, I do think there's a little bit more involved in it. I think he did – Judge Reeves did a risk-benefit analysis on that. Basically, it was what you did worth the risk long enough so that you can keep the money. I don't think that type of analysis is proper for sophisticated means because a lot of cases say it's not the success, it's how you do it. In relation to the clarification of the amendment, I disagree with it being a clarification unless we want to say it clarified the United States v. Craig was correct. And it always has been. I do want to say one thing about the parents' stolen ID that they're claiming. This was never proved in the district court. As a matter of fact, we objected to it in the PSR. In the PSR, they said, we're not taking it into our calculations. These two girlfriends they keep on talking about. It doesn't impact the calculations. And Judge Reeves never took that into effect. So I don't think that's ever been found, and I don't think that should be a proper basis for this court to make any type of ruling on this. Thank you. Thank you, Mr. Rager and Ms. Cornett. I know you both have accepted the appointment here under the Criminal Justice Act, and we know you do that as a service to the court, so the court is very appreciative of your fine efforts today and leading up to today. So thank you very much for that. There being no further cases, the court may be adjourned.